Hillsborough, }
May 6, 1924. }

FREDERICK J. GAFFNEY, *Ex'r, Ap'ee, v.* CATHERINE F. COFFEY.

Upon the issue of undue influence over a testator, the proponent of the will
has the burden of establishing that it is the free and voluntary act of the
testator; and the presumption of fact, which in the absence of suspicious
circumstances excuses such proof until substantial evidence of undue in-
fluence is offered by the contestant, neither extinguishes the original issue
nor shifts the burden of proof to him. In that case such presumption, hav-
ing performed its office, ceases to have controlling force or probative value.

Where a charge as a whole is sufficiently favorable to the excepting party as to
the matter excepted to, his exception will be overruled.

Certain evidence as to threats made to, and influence exerted over a testatrix
warranted the submission to the jury of the question whether her will was
the result of over-persuasion and undue influence.

PROBATE APPEAL, from a decree allowing the will of Abbie Gaffney.
Trial by jury and verdict for the appellant. Transferred by *Kivel,*
C. J., upon appellee's exceptions to the denial of his motions for a
directed verdict and for a dismissal of the appeal and to the charge.

The testatrix was the widow of Patrick Gaffney, who died on
August 16, 1916, leaving surviving him three children, the appellant,
called Kate, 42 years of age, the appellee, called Fred, 35 years,
and Mamie, 31 years. Kate married at the age of seventeen and
after two and one-half years' residence with the parents, went with
her husband to a home presented to her by the father. Fred was
educated by his father for the law, was admitted to the bar in 1905,
and has since practiced his profession at Nashua, continuing to reside
with his parents. Mamie completed her schooling at sixteen and
remained at home, assisting in the housework without wages until
May 30, 1920.

The father died testate, leaving an estate consisting principally
of tenement property in Nashua valued at about $14,000. After
naming his children in bequests of one dollar each, he devised all
his estate to his widow. After his death, the mother, Fred and
Mamie continued to reside at the old home on Pearl street in Nashua
until July 6, 1918, when they removed to a house on Palm street,
toward the purchase of which the mother contributed a substantial
amount, the title, however, being taken in Fred's name. Immediately
following the father's death, the mother, Abbie, executed a will
by which she bequeathed $200, to Kate and devised the balance
of her estate in equal shares to Fred and Mamie. The will was

left by her for safe-keeping with an attorney and friend of the family, by whom it was drawn.

The family relations were pleasant and harmonious until Mamie received attention from her present husband, Arthur Pappachristo, a Greek merchant, who was *persona non grata* to the other members of her family, but particularly to the appelee. The family objections, so far as disclosed, were based upon nationality and the fact that he was a widower with three small children. On May 30, 1920, Mamie left the Palm street home under circumstances which will appear in the opinion and was married to Pappachristo on June 7, following.

Two days after the departure of Mamie from the home, namely, on June 1, the last will of Abbie Gaffney was drawn and executed at the office of an attorney from data furnished by her. The earlier will, which she had obtained from its custodian and brought with her, was there destroyed. None of the interested parties were present. The will, after a bequest of $100 to Kate and one dollar to Mamie, devised the remainder of her estate in fee to Fred, whom she named as executor. The appraised value of her estate, consisting principally of the real estate devised to her by her husband, was $14,799.

The age of the testatrix at the time of the execution of the will is not in evidence, except as it may be inferred from the ages of the children. She was of Irish birth and came to this country when she was very young. She could write her name and read her prayer book. She was normally strong of body and mind. Her intelligence and memory were good for one of her years and opportunities. No claim was made that she was not of sound mind, and, as against everybody but the appelee, of strong will power. The sole issue submitted to the jury was: "Was Abbie Gaffney, the testatrix, induced to execute the instrument in question by reason of undue influence, over-persuasion, artful misrepresentation, or threats on the part of Frederick J. Gaffney?" Other facts appear in the opinion.

*Warren, Howe & Wilson* and *Frederick J. Gaffney* (*Mr. Howe* orally), for the appelee.

*Doyle & Doyle* and *Cobleigh & Cobleigh* (*Mr. Marshall D. Cobleigh* orally), for the appellant.

SNOW, J. It is conceded that the testatrix had sufficient mental capacity to make a will and that the will was executed with legal

formality. The single contention of the appelant is that the will was the product of undue influence exerted over the testatrix by the son. The appelee, on the other hand, claims that the will was the voluntary act of the mother, prompted only by her own dissatisfaction with Mamie's conduct in accepting the attentions of Pappachristo. Such displeasure on the part of the mother is conceded. The sole question, therefore, raised by the appelee's motion for a directed verdict is whether there was substantial evidence from which the jury could find that the threats and over-persuasion of the son, rather than the mother's own displeasure, produced the will. This necessitates an analysis of the appelant's proofs, considered in the light most favorable to her contention.

The appelant's evidence tended to show that, beginning in the latter part of 1919, Fred, in the presence of his mother, gave expression to his opposition to Mamie in language and manner calculated to prejudice and to intimidate the mother in respect to the disposition of her property if his sister should persist in her attachment for Pappachristo. On this phase of the case the evidence of the appelant and her witnesses was in substance as follows: that in August or September, 1919, Fred said to Mamie in the presence of her mother, "If you ever have anything to do with that damn Greek you will never get a cent of my father's money for that damn Greek to spend"; that at the same time he said to the mother, "Now, if she is going to keep company with this Greek, you must do something and do it quick, because he is never going to have a cent of my father's money"; that in December, 1919, during an altercation with Mamie as to whether she was making the Greek a Christmas present, he slapped his sister in the face, blackening her eye, called her by a vile name and pursued her to the kitchen, causing the mother to fall on the stove; that on January 1, 1920, while partially under the influence of liquor, he told them with an oath that if Mamie didn't stop keeping company with the Greek they would both have to get out, that he wasn't going to stand it any longer; that he said to his mother, "You are hiding up this girl, and she is going out with this damn Greek all the time, and it has got to be stopped or else I won't keep you in this house; and if you don't act as I want you to act you will have to get out of this house"; that he threatened to kill Mamie and the Greek if he should ever meet them together, and accompanied such threats by conduct tending to terrify the mother; that nearly every morning following January, 1920, he inquired of his mother before leaving

for his office, "Well, have you done anything about changing that will yet?" and, upon an evasive reply from the mother, he would say, "Well, I want you to change it and change it damn quick, too"; that like threats were repeated nearly every day until May 30 following; that with the apparent purpose of intimidating the mother, he claimed to be suffering from the nervous strain occasioned by Mamie's conduct and threatened to go to a sanatorium; that on May 30 upon the return of the mother and sister from mass he met them upon their entrance at the home and said, "Now, you stand just where you are. . . . Now, one of you is just as bad as the other one. You are shielding her and hiding her up long enough, and she is keeping company with this damn Greek, and the two of you must get right out"; that when Mamie, following his direction, left the house, he followed her to the door and calling her by a vile name said, "Now you go, . . . and don't you ever come back to this house again"; that the next forenoon, May 31, the mother called on her brother-in-law to come over to console Fred, saying that she was afraid he would commit suicide, and that he had threatened her; that the brother-in-law found Fred walking the corridor with his hands at his head, saying, "Oh, dear, what shall I do? Mother, Mamie will never come into this house again. Mother, if you die in the morning, Mamie can't come in here and look at you." The will was made the forenoon of the following day. That such conduct and threats were of a character calculated to produce the change made in the will is apparent.

The state of mind of the mother as respects Mamie's conduct, according to appellant's evidence, was not vindictive in character, but was one of sorrow, of regret at losing the companionship of her daughter, and of worry for the hardship to Mamie in assuming the care of a family of small children. It is evident that a jury might find the appelee's threats and importunities more potent as a moving cause for the mother's action than her own displeasure with Mamie's conduct, and that except for such threats and importunities the testamentary changes would not have been made.

In weighing the effect of Fred's threats and importunities on the mother, her situation was material. The mother, Fred and Mamie had been living in intimate physical and mental association. The mother was dependent upon Fred in many ways. He was her adviser and counselor in her business affairs, so far as she had need of one, and attended to the management of her property. Although the home was regarded as the mother's in the sense that she was

the mistress, the house from which he was threatening to drive her was his. Having in mind this situation the effectiveness of Fred's conduct on the mother is apparent from her statements and bearing coincident therewith. Appellant's evidence showed that following the episode of January 1, 1920, the mother said to a son-in-law, "What am I going to do?"; "that fellow" (referring to Fred) "has broken my heart; I don't know what I am going to do, Johnnie. What is going to become of me?"; that in February, 1920, she said to her niece that he had been raising Cain and raving continually and making life unbearable for her and Mamie; that when Fred threatened to go to a sanatorium, the mother appeared nervous and told Mamie she did not know what she would do if he went away and what would happen to him; that some two weeks later she stated to Mamie, "I have got to do something about my will. He doesn't let me alone one minute. He never gives me any peace. Now I have got to do something to satisfy him"; that she made inquiries for a tenement, and referring to Mamie and herself, stated, "We don't know what is going to become of us; he is carrying on something terrible"; that in the forenoon of May 30, the day following Mamie's departure, the mother went to her niece's house crying, and told her that Fred had put Mamie out; that on the same day Fred said to his cousin that his mother was at home crawling on her hands and knees to him, begging him to look for Mamie and take her back, to find her; that she stated to her son-in-law within two weeks after the execution of the will, "I have been down to make my will. Then I hope and trust in God . . . that Fred will give me peace."

It could be found from this evidence that the testatrix, moved by a fear of consequences to the appelee, Mamie and herself, induced in turn by appelee's excessive importunities and threats, made the will for the sake of peace. If so found, the appelee's conduct was the equivalent of force, taking away the free agency of the testatrix and substituting for her will the will of the appelee, so that the instrument is not an expression of her wishes but of his. Such a will is void. *Whitman* v. *Morey*, 63 N. H. 448; 453; *Albee* v. *Osgood*, 79 N. H. 89, 92; *Loveren* v. *Eaton*, 80 N. H. 62, 65; *Bartlett* v. *McKay*, 80 N. H. 574.

The fact that the appelee was not present at the execution of the will, and the absence of evidence that he had knowledge of the will or its execution until after the death of the testatrix, are not controlling. It is sufficient that it can be found from the evidence

that the motives induced by his previous threats and importunities were operative upon the mother at the time of such execution. The appellant's evidence, covering the period of the remaining thirteen months of the mother's life, confirms the unrelenting bitterness of Fred's animosity for his sister Mamie, the virulence with which it was manifested, the mother's continuing fear of his displeasure as well as her continuing strong affection for Mamie. Specifically it tended to show that he forbade Mamie's name to be mentioned in the home; that he admonished relatives not to harbor or recognize her; that he refused, until the day of the trial, to speak to his sister Kate and to the several other relatives who received or befriended his sister Mamie; that the mother arranged for, and had, clandestine weekly meetings with Mamie at the homes of relatives and secretly sent presents of goods and money to her, — as to both of which the mother enjoined secrecy upon those who assisted her because, as she said, "Fred hears everything."

Appelee's evidence denying the conduct charged and imputing to the mother motives of her own for the testamentary changes is not so convincing as to overcome the appellant's proofs and conclusively to establish the appelee's contentions. Moreover, the jury may not have believed the appelee and his witnesses.

The appellant testified upon cross-examination: "Q. How long before she married him did you hear your mother speak words of disapproval about Mary's going around with Pappachristo? A. Probably six months. Q. And she continued to disapprove of her going with him and marrying him, didn't she? A. She said in this way: That she thought the family was too much for her to take care of. Q. I asked you first a simple question. Didn't she always speak words of disapproval in regard to Mary's [Mamie's] going around with Pappachristo? A. That is the only time she ever spoke of it to me. Q. Six months before? A. Yes, sir; we never talked on the subject at all. Q. She spoke about it May 31st, didn't she, — May 31, 1920, when she said she was going to make a will? A. Yes, sir. Q. And going to make it on account of Mary's going away? That was the reason, wasn't it? A. I suppose so. Q. You know it, don't you? A. Well, very likely. Q. I am asking you point-blank if you don't know that was the reason she was going to make this last will of hers? A. Yes, sir." The appelee contends that the appellant is concluded by her last answer and that thereupon a verdict should have been directed for him. Appelant's assent to the statement of counsel does not bear the ex-

clusive interpretation that the witness knew that the mere fact of Mamie's "going away" supplied the testamentary motive independent of the circumstances surrounding her leaving. The appellant had testified on direct examination that the mother had told her on May 30 of Fred's conduct that day in ordering Mamie to leave the house, and that the mother had fussed and cried all that afternoon and was worried about Mamie. The latter's involuntary exile from the home at the command of Fred and to the great grief of the mother was a part of the "going away." It does not conclusively appear that the appellant intended to testify that she knew that the mother's sole motive in changing the will was the mere fact of Mamie's leaving unaffected by Fred's conduct, or, in other words, that she intended to admit that her appeal was without foundation.

The appellee excepted to the denial of his request for instruction, — "Where once it has been proved, as it has been in this case, that the will of Abbie Gaffney has been executed with due solemnities by her as a person of competent understanding, and, apparently a free agent, the burden of proving that it was executed under undue influence is on the party who alleges it." If by "burden of proving" is meant the burden of going forward with the evidence (*Spilene* v. *Company*, 79 N. H. 326), the ruling requested is a correct statement of the practice. Such appears to have been the rule of the trial. Under this interpretation of the request, it is clear that a statement of the rule in the charge would have had no practical significance. If, however, as seems probable, the appellee intended the request as a direction that the verdict should be for the appellee if the jury should find the evidence upon the controverted question of undue influence *in equilibrio*, the ruling requested does not correctly state the law. The proponent of the will had the burden of proving its due execution, voluntarily, by a competent testator. Upon proof of the voluntary formal execution of the will by a competent testator, in the absence of circumstances arousing suspicion, the proponent of a will is not required to offer express affirmative proof of the absence of undue influence. *Albee* v. *Osgood, supra.* The presumption of fact, which excuses such offer of proof, however, neither extinguishes the original issue nor shifts the burden of proof to the contestant. It simply suspends the requirement of further proof of the voluntary character of the testator's act until it is called in question, if at all, by the submission of substantial evidence of undue influence by the contestant. When, as in this case, the ap-

pelant has supported her contention by the submission of such substantial evidence as will support a finding of undue influence, the presumption of fact created by the formal proof of the will has performed its office and is no longer of controlling force or of probative value. Under these circumstances, if the jury should find upon a consideration of the conflicting testimony upon this issue that a condition of even balance of the evidence has been reached, the proponent of the will has failed to maintain the ultimate burden of proof which is his from the beginning to the end of the trial. In other words, he has failed to establish that the will is the free and voluntary act of the testatrix. *Edgerly* v. *Edgerly*, 73 N. H. 407; *Patten* v. *Cilley*, 67 N. H. 520, 527; *Perkins* v. *Perkins*, 39 N. H. 163, 171. The request was properly denied.

The appelee excepted to the first sentence in the following paragraph of the charge as given, viz., "Now, gentlemen, the burden of proof, technically so called, rests upon the executor to satisfy you that at the time the instrument was executed it contained the will (and not the will of another) of Abbie Gaffney, not produced by undue influence, over-persuasion, artful misrepresentation or threats on the part of Frederick J. Gaffney. But proof in questions of this kind simply means that you must be persuaded of the truth of the proposition by a simple preponderance of the evidence. And, gentlemen, you are to decide upon all the evidence whether it is more probable that Mrs. Gaffney, when she executed the instrument, executed it of her own free will." The court further instructed the jury, "The law presumes the absence of undue influence upon proof of the voluntary, formal execution of a will by a competent testator, and that in the absence of circumstances arousing suspicion, the proponent of a will is not required to offer affirmative proof of the absence of undue influence. Undue influence cannot be presumed. In other words, gentlemen, if undue influence is set up as a cause for setting aside a will, the fact of undue influence must be established by evidence. To repeat: Undue influence cannot be presumed. In other words, it must be proved by competent evidence." This latter clause of the charge complements and makes plain the meaning of the clause excepted to. Taking the charge as a whole, the statement of the law appears to have been sufficiently favorable to the appelee.

Appelee's further exceptions appear to have been waived.

*Exceptions overruled.*

All concurred.